COMMONWEALTH *vs.* VICTOR DEGRO.

Essex. May 5, 2000. - August 17, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, SPINA, & COWIN, JJ.

*Practice, Criminal,* Comment by prosecutor, Required finding, Argument by prosecutor, Instructions to jury, Assistance of counsel, New trial, Findings by judge, Waiver, Capital case. *Evidence,* Prior misconduct. *Homicide. Constitutional Law,* Assistance of counsel.

At a murder trial, the prosecutor's description in opening argument of the murder weapon, a knife, was not a mischaracterization, and his description of the murder scene was not improper. [322]

At a murder trial, the prosecutor's questions about the victim, the victim's family, and a witness's memory of the crime scene were not an improper attempt to elicit sympathy and did not create a substantial likelihood of a miscarriage of justice. [322-324]

At a murder trial the judge correctly excluded evidence of the victim's propensity for violence and convictions for assault and battery, where there was no evidence that the defendant knew of any such propensity; and the judge correctly excluded evidence of the same prior bad acts, proffered for asserted impeachment purposes. [324-325]

At a murder trial, the evidence was sufficient to prove beyond a reasonable doubt that the defendant acted with deliberate premeditation, and the judge correctly denied the defendant's motion for a required finding of not guilty. [325]

At a murder trial, the prosecutor's remarks in closing argument did not amount to an improper attempt to arouse juror sympathy [325-327], nor did the prosecutor misstate the evidence [327-328] or the definition of the presumption of innocence [328]; further, the prosecutor's improper exhortation to the jury to "do your job" did not create a substantial likelihood of a miscarriage of justice, in light of the evidence against the defendant and the judge's instructions to the jury [328-329].

Where, at a murder trial, there was ample evidence of deliberate premeditation, no substantial likelihood of a miscarriage of justice was created by the judge's failure to give an instruction regarding premeditation that the defendant had not requested. [329]

At a murder trial, the judge's instructions to the jury on the degrees of murder were correct. [330]

The evidence at a murder trial did not warrant instructions to the jury on voluntary or involuntary manslaughter and the judge did not err in not giving those instructions. [330-331]

There was no error, at a murder trial, in the judge's reversing his decision to give an instruction on voluntary manslaughter just before closing argu-

ments and after giving defense counsel an opportunity to be heard, and the defendant demonstrated no prejudice to counsel's closing argument thereby. [331-332]

At a murder trial, there were no errors committed by trial counsel that would support a claim on appeal of ineffective assistance of counsel. [332-334]

The judge at a murder trial correctly denied the defendant's motion for a new trial based on a claim of ineffective assistance of counsel, where, after an evidentiary hearing, the judge properly concluded that trial counsel had reasonably and adequately advised the defendant of his right to testify; that the defendant knowingly, voluntarily, and intelligently waived his right to testify; and that the failure of defense counsel to obtain counselling records to impeach a witness would not have achieved anything for the defense. [334-338]

INDICTMENT found and returned in the Superior Court Department on November 30, 1994.

The case was tried before *Raymond J. Brassard*, J., and a motion for a new trial was heard by him.

*Maxine Sushelsky* for the defendant.

*Deirdre L. Casey*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation. We consolidate the appeal from his conviction with the appeal from the trial judge's denial of his motion for a new trial. The defendant claims numerous errors occurred during the trial and that the judge erred in the denial of his motion for a new trial. He also asks us to invoke our extraordinary power pursuant to G. L. c. 278, § 33E. After reviewing the entire record, we decline to exercise our power under G. L. c. 278, § 33E, to order a new trial, or to direct entry of a verdict of a lesser degree of guilt. We affirm both the conviction and the denial of the motion for a new trial.

*Facts.* The jury could have found the following facts. At approximately midnight on November 13, 1994, the defendant approached the victim, Daniel Santiago, outside the apartment building in which they both lived in Lawrence and stated, "I want to talk to you." Santiago indicated that he did not want to talk with the defendant, reached into his pocket, and took out a cigarette. The defendant ordered him to drop the cigarette. Santiago ignored him and turned toward the stairs of the apartment building. The defendant followed the victim and again ordered him to drop the cigarette. When the victim asked why, the

defendant punched the victim in the mouth. Santiago fell against the balcony and hit his head. The victim told the defendant to "leave him alone," and began climbing the stairs to his apartment. The defendant continued to pursue Santiago, repeating that he wanted to "talk." When Santiago said he had been drinking and did not feel well and that they could talk the next day, the defendant punched him again, knocking him backwards onto the stairs. Santiago got up and started to climb the stairs again, but before he reached his apartment, the defendant drew a knife from his "back" and stabbed him three times, once in the back and twice in the leg.[1] One of the stab wounds in the leg was four inches deep. Each of the wounds could have been fatal.

Santiago's live-in girl friend, Miriam Melendez, and her son, David, awakened by a neighbor's telephone call, rushed to their apartment door.[2] David observed the defendant stab Santiago as he staggered into the apartment and fell into David's hands. David held the victim's head as he lay in the doorway, bleeding. David did not see the knife in the defendant's hand until after the victim fell. Melendez observed the defendant standing outside the apartment holding a knife. She asked him why he did it and he answered, "because [the victim] called my mother a bitch." The defendant ran to a parked car with three passengers inside and the motor running; he got into the driver's side and "took off." Santiago died at the scene shortly thereafter as a result of the stab wounds. The defendant was arrested in New Hampshire the day after the killing. After receiving his Miranda rights, when asked "where the knife was," the defendant responded, "I threw it in the Merrimack [River]." The defense sought to establish that the killing was not premeditated.

*Pretrial.* On January 6, 1997, when the Commonwealth moved for trial, defense counsel sought a short continuance because he needed to have his ill sister admitted to a hospital. A two-day continuance was granted and, on January 8, a jury were empanelled. On January 9, due to his sister's deteriorating

---

[1]The testimony as to these events was provided primarily by one neighbor with various portions of it corroborated by another neighbor and by family members at the scene. The location of the wounds was corroborated by the testimony of the medical examiner.

[2]Santiago lived with Melendez, their son, and her two children from a previous marriage (one of whom is David).

medical condition, defense counsel sought a further continuance until January 13, 1997; he said that personal problems affected his ability to try the case immediately, and that he had advised the defendant of this fact. The judge told defense counsel to appear on January 13 and then, depending on his sister's condition, he could seek a further continuance, move for a mistrial, or proceed with the trial. The judge informed the jury in general terms that the reason for the delay was that defense counsel had a family emergency. Defense counsel never sought further relief and testimony began on January 13, 1997.[3]

1. *Opening statement.* An opening statement is "to outline in a general way the nature of the case which counsel expects to . . . prove." *Commonwealth* v. *Hoilett*, 430 Mass. 369, 372 (1999), quoting *Commonwealth* v. *Fazio*, 375 Mass. 451, 454 (1978). The defendant argues that two remarks in the opening statement by the prosecutor were improper attempts to obtain juror sympathy. He claims that the prosecutor mischaracterized the evidence by describing the knife the defendant used as one that looked "like the type you cut meat or vegetables with." There was no objection to this statement. There was no error. During trial, there was evidence that the knife was "a kitchen knife . . . [a] long, big knife," a "big knife . . . [a] cutting knife," and a "[k]itchen knife, big one." The prosecutor's words were a permissible description of the anticipated testimony. The prosecutor also stated: "And you can picture this scene as [the victim] falls and is laying there bleeding on that floor in front of you." There was no objection to this statement either. It was not improper.[4]

2. *Sympathy testimony.* The defendant claims that the Commonwealth was improperly permitted to elicit sympathy for Santiago's family through questions to Melendez about their home life and his work life and by introducing a photograph of the couple. The defendant did not object to the questions about the victim's home life nor to the admission of the photograph. He did object to the question, "Do they have some memory of him at [his place of employment]?" The objection was overruled; the prosecutor was told to "move on"; and there were no

---

[3]The defendant is represented by new counsel on appeal.

[4]While this statement was not error, we caution prosecutors in particular, because they deal with subject matter that tends to be emotional, to proceed with caution that their opening statements do not slip into emotionally provocative argument.

further inquiries about his work. The contested questions about his home life were limited in number and scope, and simply elicited family background information. The Commonwealth may "tell the jury something of the person whose life [has] been lost in order to humanize the proceedings." *Commonwealth* v. *Santiago*, 425 Mass. 491, 495 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998); and a photograph may be admitted for this purpose. *Commonwealth* v. *Andrews*, 403 Mass. 441, 450-451 (1988). There was no error. The question concerning whether he was remembered at work was not proper, but it surely could not have made a difference to the verdict. *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).

The defendant also claims the prosecutor should not have been permitted to ask Melendez why she and her family were living in Georgia at the time of trial. Again, there was no objection. The witness responded, "The City of Lawrence." It is unclear what the witness meant by this response. Further, Melendez testified that she still worked for the same company, now at their factory in Georgia. Although such testimony was not relevant, the answer did not create a substantial likelihood of a miscarriage of justice. The question was an isolated one and the defendant's claim that the question suggests that the witness was in protective custody is specious.

Finally in this regard, the defendant alleges that the prosecutor improperly elicited "sympathy" testimony through questions on redirect examination of Melendez's son, David. Cross-examination of David attacked his memory of the details of the incident, eventually provoking the response: "I don't remember what happened, because it was two years ago and [my memory is] not that good . . . ." On redirect examination, the prosecutor asked the following four questions: "Do you remember [the victim] falling into your arms that night?" "Do you remember [the defendant] lunging at [the victim] to stab him that night?" "Is that a clear memory in your mind?" "Will you ever forget that?" While the final inquiry should not have been made, there was no objection to any of these questions. A witness "may explain, modify, or correct damaging testimony that [has been] elicited on cross-examination." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 718 (1993), cert. denied, 513 U.S. 835 (1994), quoting *Commonwealth* v. *Mandeville*, 386 Mass. 393, 400 (1982). The effective cross-examination warranted the first three

questions, and the last question does not create a substantial likelihood of a miscarriage of justice.

3. *The victim's prior bad acts and propensity for violence.* The defendant next claims that the judge erred in preventing him from cross-examining witnesses about Santiago's propensity for violence and his prior convictions for assault and battery of a household member. The judge precluded such evidence, indicating that he would only allow evidence of Santiago's reputation for, or recent specific acts of, violence known to the defendant. There was no error. Evidence of a victim's propensity for being violent or of his specific prior bad acts is permitted only when the defendant asserts a claim of self-defense and makes a showing that he was aware of the violent character of the victim prior to the incident in question so that he reasonably believed he was in imminent danger. See *Commonwealth* v. *Pidge,* 400 Mass. 350, 352-353 (1987); *Commonwealth* v. *Fontes,* 396 Mass. 733, 735 (1986). There was no showing that the defendant was aware that Santiago had any propensity to be violent.

The defendant also attempted to introduce the prior bad acts as impeachment evidence. The victim's girl friend, Miriam Melendez, who was an important Commonwealth witness, testified that she and the defendant had a good relationship. Defense counsel's plan was to impeach Melendez's credibility and the credibility of her daughter by establishing that she and Santiago did not have as good a relationship as the prosecution had portrayed. There was no showing, however, that the girl friend was the victim in the assault and battery convictions. Even if she were, the relevance of the convictions is questionable, as it is less than clear that Santiago's convictions for domestic assault and battery would impeach another witness's credibility. Finally, the evidence of the prior convictions appears to have been offered in an attempt to put impermissible evidence of the victim's bad character before the jury. The judge was well within his discretion in excluding this evidence.

The defendant attempted, too, to elicit evidence of violence between the victim and his girl friend through cross-examination of Melendez's daughter.[5] Again, it is not apparent that such evidence would impeach the daughter and this was merely an

---

[5]Melendez's daughter's testimony only concerned a disagreement that she could possibly have been the source of the defendant's animosity toward the victim.

attempt to place improper evidence before the jury. Further, the defendant was permitted to inquire whether the daughter was aware of any violence or arguments between the victim and Melendez, and she responded in the negative.

4. *Sufficiency of the evidence.* The defendant argues that his motion for a required finding of not guilty on the charge of murder in the first degree should have been allowed because the evidence was insufficient, as matter of law, to prove beyond a reasonable doubt that the defendant acted with deliberate premeditation. We conclude that there was sufficient evidence to support the jury's verdict.

In reviewing a denial of a motion for a required finding of not guilty, our inquiry is whether the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt. See *Commonwealth* v. *Coonan*, 428 Mass. 823, 828 (1999); *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). In satisfying that test, the Commonwealth may rely on reasonable inferences drawn from circumstantial evidence. *Commonwealth* v. *Marquetty*, 416 Mass. 445, 452-453 (1993). The jury reasonably could have "inferred from the evidence that the defendant acted with deliberate premeditation, having 'resolved to kill after a period of reflection.' " *Commonwealth* v. *McAfee*, 430 Mass. 483, 494-495 (1999), quoting *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994). The eyewitness evidence of the encounter, together with the fact that the defendant was carrying a large knife and stabbed Santiago three times, after twice punching him, warrants a finding of deliberate premeditation. See *Commonwealth* v. *Andrews*, 427 Mass. 434, 440 (1998) (firing four shots at unarmed victim at close range more than sufficient to warrant finding of deliberately premeditated murder); *Commonwealth* v. *Williams*, 422 Mass. 111, 122-123 (1996) (firing three shots supports reasonable inference of premeditated murder).

5. *Closing argument.* The defendant contends that the prosecutor's closing argument improperly (a) attempted to arouse juror sympathy; (b) argued matters not supported by the evidence; (c) misstated the definition of the presumption of innocence; and (d) implored the jury "to do your job." He claims that the cumulative effect of these errors constitutes prejudicial error, requiring reversal. We consider the closing argument as a

whole, *Commonwealth* v. *Dixon*, 425 Mass. 223, 230 (1997), and we "consider the fact that the defendant did not object to the statements at trial as 'some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial.' " *Commonwealth* v. *Lyons*, 426 Mass. 466, 471 (1998), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 380 (1995). Further, as there was no objection to the statements, our inquiry is confined to determining whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991), and cases cited.

The defendant maintains that the following five passages sought to arouse juror sympathy:

(a) "His family is there, his common-law wife who he has been with for nine years, his step-children — you heard one of them call him 'dad' — his young son, who is only four years old at that time. And he's going home";

(b) "And you can picture this scene as [the victim] falls and is laying there bleeding on that floor in front of you";

(c) "Now [David Lopez] he's not [the victim's] son, but you'll remember he said, my dad; because Daniel Santiago has been the dad in this family for eight, nine years";

(d) "This woman has just had her husband collapse in a pool of blood at her feet. David Lopez has had the man who's been acting as his father fall dying into his arms. This is a shocking situation";

(e) "Anna Reyes saw a horrible thing out her back window."

The first remarks were at the outset of the closing, preceded by the prosecutor's statement that Santiago had been out drinking and then the question: "And what is he doing? He's trying to go home." Thus, the passage complained of simply set the scene, explaining that the victim was going home to his family, i.e., describing that Santiago was not seeking a fight, and that the whole attack was totally unprovoked, senseless, and unnecessary. There was no excessive reference to Santiago's family or to the age of his young child. Cf. *Commonwealth* v. *Santiago*, 425 Mass. 491, 494 (1997) (impermissible appeal to

sympathy where prosecutor seven times stated young victim's age and pregnancy and four times referred to her birth date in relation to the murder). The remaining four segments explain why witnesses did not remember every detail of the event. "When credibility is an issue before the jury, 'it is certainly proper for counsel to argue from the evidence why a witness should be believed.' " *Commonwealth* v. *Freeman*, 430 Mass. 111, 119 (1999), quoting *Commonwealth* v. *Raymond*, 424 Mass. 382, 391 (1997).

The defendant also argues that certain statements in the closing were not supported by the evidence; those that suggest that the defendant was waiting "in ambush" for Santiago; the references to a "getaway" car; and the description of the knife. The prosecutor is entitled to "draw inferences from [the] evidence." *Commonwealth* v. *Duguay*, 430 Mass. 397, 404 (1999), quoting *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993). Anna Reyes, a neighbor of Santiago, testified that she saw him get out of his car and that the defendant then accosted him and insisted on speaking with him. She testified further regarding the remaining details of the unprovoked attack. There was also testimony that the weapon was a large kitchen knife, not a folding knife, and that the defendant took this knife from his "back." This testimony clearly gives rise to a reasonable inference that the defendant was waiting to "ambush" Santiago. Contrary to the defendant's contention, the fact that the defendant and the victim both lived in the same apartment building does not negate the inference that the defendant was waiting for the victim to arrive to fight with him.

As to the prosecutor's reference to a "getaway" car, Reyes testified that, after stabbing Santiago, the defendant ran to a car that had its motor running and three people waiting inside. It was not unreasonable to describe this vehicle as a "getaway" car.

The prosecutor discussed the knife as follows:

> "Does someone carry a kitchen knife, the kind you cut up meat or vegetables with . . . a butcher knife, as it's sometimes called? I'd suggest to you that you can draw an inference as to why the defendant had that knife, and that was because he was intending to use it on [the victim] that night."

Three witnesses testified that the knife was "big," a "kitchen

knife." There was also testimony that it was "[n]ot a folding knife." The prosecutor's description of the knife as "the kind you cut up meat or vegetables with . . . a butcher knife, as it's sometimes called" was, at worst, "enthusiastic rhetoric, strong advocacy, and excusable hyperbole [which] did not cross the line between fair and improper argument." *Commonwealth* v. *Freeman, supra* at 120, quoting *Commonwealth* v. *Lyons, supra* at 472.[6] And the inference the prosecutor asks the jury to draw, that the defendant possessed the knife because he was planning to use it on Santiago "that night," is well warranted.

The defendant claims further that the prosecutor misstated the definition of the presumption of innocence and improperly implored the jury "to do your job." The language complained of is: "But that presumption of innocence only lasts until evidence is presented to you, the jury, that a person is guilty of a crime. And, in this case, ladies and gentlemen, the Commonwealth has presented evidence that this man is guilty of first-degree murder. And now, ladies and gentlemen, it's time for you to do your job." Concerning the presumption of innocence, the defendant parses the prosecutor's argument too finely. If the first sentence is read as meaning that the presumption of innocence lasts until evidence is presented *that convinces the jurors* that a person is guilty of a crime, the sentence is an accurate statement of the law. Although it could have been phrased more artfully, the statement does not shift the burden of proof. Further, the judge carefully instructed the jury regarding the presumption of innocence. The jury are presumed to follow the instructions of the judge. *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997).

The prosecutor should not, however, have asked the jury "to do your job." There is no difference between this exhortation and similar ones which have been deemed improper. See *Commonwealth* v. *Walker*, 421 Mass. 90, 103 (1995) (inappropriate for prosecutor to tell jurors they could, and would, "do justice"); *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. 283, 286 (1988) ("reference to the jury's 'duty,' although without an

---

[6]The defendant contends that the Commonwealth improperly used these arguments (regarding the "ambush," the "getaway" car, and the knife) to support the theory of deliberate premeditation. As the arguments were proper, and as it is a reasonable inference that the defendant made these plans before the killing, there was no error in using them to argue deliberate premeditation. Cf. *Commonwealth* v. *Rice*, 427 Mass. 203, 210 (1998).

explicit statement that its exercise will result in a verdict of guilty, should be held to pass the line of permissible advocacy"). Similarly here, a request that the jury do their "job," although not explicitly stating that this effort will result in a guilty verdict, is not permissible advocacy. Nevertheless, the statement in the circumstances did not deprive the defendant of a fair trial. As noted previously, there was no objection to the argument. Thus, we must determine whether the statement created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). The evidence in the case was very strong, in particular the eyewitness testimony. Further, the judge instructed the jury that closing arguments were not evidence and that they must determine the facts based "entirely and only on the evidence," and "certainly not on any bias, prejudice, fear or favor." He told them that they were not to "be influenced by the consequences of [their] verdict, "but that what was "required . . . is . . . the calm, cool, reflective and impartial sifting of the evidence so that here in this courtroom, justice may be done. . . . That . . . is the serious responsibility imposed upon you as trial jurors in this case." We view it as highly unlikely that the absence of the improper statement would have made a difference. Cf. *Commonwealth* v. *Freeman*, 430 Mass. 111, 119-120 (1999). The defendant was not deprived of a fair trial by the untoward remark. See *United States* v. *Young*, 470 U.S. 1, 18 (1985) (although prosecutor erred by exhorting jury to "do its job," jury "not influenced to stray from its responsibility to be fair and unbiased"). The defendant argues that the cumulative effect of the errors in the prosecutor's closing requires reversal. As there was but one error, that argument fails.

6. *Jury instructions.*

(a) *Actions after the murder.* The defendant argues that the judge should have instructed the jury that they could not consider action taken after the murder (the defendant's leaving the scene) as evidence of premeditation unless the Commonwealth had established beyond a reasonable doubt that the defendant had arranged for a getaway car before the killing took place. Cf. *Commonwealth* v. *Rice*, 427 Mass. 203, 209-210 (1998). The defendant did not request such an instruction; failure to give it did not create a substantial likelihood of a miscarriage of justice as there was ample other evidence of deliberate premeditation.

(b) *Degree of murder.* The defendant asserts that the judge's instructions violated the precept of *Commonwealth* v. *Sama*, 411 Mass. 293, 300 (1991):

> "A jury should be instructed first to decide whether the defendant is guilty of murder and, if so, then to decide whether the defendant is guilty of murder in the first degree. If so, the jury should say so by their verdict."

The defendant maintains that the judge's instruction deprived the defendant of his right to have the degree of murder found by the jury when he instructed as follows:

> "[I]f, after considering all of the evidence in this case, you find that the Commonwealth has proven beyond a reasonable doubt each of the three elements I have just defined . . . then you *shall* find the defendant guilty of murder in the first degree" (emphasis added).

The judge's instruction was correct. Indeed, the Model Jury Instructions on Homicide 9 (1999) provide that a judge is to instruct precisely as the judge in this case did, except to use the word "should," rather than "shall." For purposes of the defendant's contention, the difference between the two verbs is not significant. Further, the admonition in the *Sama* case was in the context of a case in which the judge had instructed the jury to consider first whether the defendant was guilty of murder in the second degree and then decide whether the evidence supported an additional finding of deliberate premeditation or extreme atrocity or cruelty, which would increase the verdict to murder in the first degree. We indicated that the jury "should not be instructed to find murder in the second degree and then proceed to inquire whether the defendant is guilty of murder in the first degree." *Id.* at 300.

(c) *Manslaughter instructions.* The defendant claims that the judge erred in failing to instruct the jury on voluntary and involuntary manslaughter. "If any view of the evidence would permit a verdict of manslaughter rather than murder, a manslaughter charge should be given." *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996), citing *Commonwealth* v. *Walden*, 380 Mass. 724, 726 (1980). "All reasonable inferences are drawn in favor of the defendant in deciding whether a manslaughter instruction was supported by the evidence." *Com-*

*monwealth* v. *Nichypor*, 419 Mass. 209, 216 (1994), citing *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 746 (1975). The defendant was not entitled to such an instruction. A verdict of involuntary manslaughter is warranted "only where the defendant caused an unintentional death (1) during the commission of an act amounting to wanton or reckless conduct, or (2) during the commission of a battery." *Commonwealth* v. *Brooks, supra,* citing *Commonwealth* v. *Nichypor, supra* at 217. Here, there was evidence that the defendant stabbed the victim three times with a large kitchen knife that he was carrying. Further, two of the stab wounds were in the legs and one in the back. The medical examiner testified that any one of these wounds could have been fatal. "It cannot be seriously contended that stabbing [the victim] . . . [three times in the legs and back with a large, kitchen knife, with two of the wounds each four inches deep] was not done with the specific intent to cause death." *Commonwealth* v. *Morgan*, 422 Mass. 373, 382 (1996) (stabbing victim in abdomen with knife with six-inch blade). There was no evidence of either wanton or reckless conduct, or an unintentional killing. "An involuntary manslaughter charge is not required when it is obvious that the risk of physical harm to the victim creates a 'plain and strong likelihood that death would follow.' " *Commonwealth* v. *Brooks, supra* at 578, quoting *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547 (1993).

Nor did the evidence warrant a verdict of voluntary manslaughter. "Voluntary manslaughter is 'a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' *Commonwealth* v. *Vanderpool, supra* at 746, quoting *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931)." *Commonwealth* v. *Nichypor, supra* at 216. There was no evidence that the defendant acted out of sudden passion or was provoked in any way by Santiago, or that the incident occurred in the course of sudden combat. Indeed, Santiago, by all accounts, did nothing at all to provoke or resist the defendant. There was no error in failing to give a manslaughter instruction.

(d) *Charge conference.* The defendant claims that the judge erred when he reversed his decision to instruct on voluntary manslaughter immediately prior to trial counsel's closing argument. He claims that this alteration undermined trial counsel's closing argument. At the charge conference, held directly following the completion of the evidence, the judge indicated that

he would instruct the jury on voluntary manslaughter. The following morning, however, the judge informed counsel that after "considerable thought" he had concluded that the evidence did not warrant such an instruction. The judge permitted defense counsel to reargue the issue; counsel was unsuccessful in his argument and objected to the judge's decision, but did not request any time to revise his closing argument. The judge ordered a five-minute recess prior to closing arguments. A trial judge must inform counsel of his proposed instructions before final argument. Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979). The judge complied with this requirement; trial counsel did not indicate that he was unprepared to proceed as a result of the revision, and never sought a continuance. Further, the defendant does not identify any specific harm caused by the judge's ruling. There was no error.

7. *Ineffective assistance of counsel.* The defendant also alleges that he was denied his constitutional right to the effective assistance of counsel because his trial counsel was not prepared and filed incomplete motions for required findings; asked confusing and inarticulate questions; improperly questioned a witness through an interpreter; and presented an incoherent and unfocused closing argument. The standard for examining such an ineffective assistance of counsel claim in a capital case is more favorable to the defendant than in other cases. In capital cases, we determine whether there was an error in the trial that was likely to have influenced the jury's conclusion. *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998). An attorney's tactical decisions amount to ineffective assistance of counsel only if "manifestly unreasonable" when made, *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). The defendant has the burden to demonstrate that the errors "were likely to have unfairly influenced the jury's verdict." *Commonwealth* v. *Scott*, 430 Mass. 351, 356 (1999), citing *Commonwealth* v. *Plant*, 417 Mass. 704, 715 (1994). Because we conclude that there was no error by trial counsel, the defendant's claim of ineffective assistance of counsel is unavailing.

Defense counsel orally requested required findings at the conclusion of the Commonwealth's case and at the conclusion of all the evidence. Both motions were denied by the judge from the bench. The defendant presents no specific examples of the questions complained of. Trial counsel vigorously cross-examined all the Commonwealth's witnesses. His questions to

witnesses through an interpreter may have been awkward, but he was able to probe the inconsistencies in their testimony. "Any lawyer combing the record can try the case better." *Commonwealth* v. *Scott*, 428 Mass. 362, 369 (1998), quoting *Commonwealth* v. *Carlos*, 38 Mass. App. Ct. 929, 932 (1995). "A list of subjective critiques of defense counsel's [performance], absent a showing that errors likely affected the jury's conclusions, is insufficient to support an ineffective assistance claim." *Commonwealth* v. *Scott, supra.* It is far too easy to examine a transcript and point to ways to "do it better." The closing argument focused on the theory on which the defendant had tried the case: that he had not acted with premeditation. This was a reasonable choice, in the face of overwhelming evidence of guilt. *Commonwealth* v. *Scott*, 430 Mass. 351, 358 (1999). The problem for counsel was that there was eyewitness testimony to the murder, a circumstance difficult to combat. The defendant claims that his counsel suggested a lower burden of proof for the Commonwealth by the following statement:

> "Now, the Commonwealth bears the burden of proof, all the way up until now. Even now, it bears the burden of proof, proof beyond a reasonable doubt, that doubt which brings you to a moral certainty. Not speculation. Not guesswork. Not saying it had to happen this way, it could have happened this way, but it did happen this way and he's guilty. That's the Commonwealth's burden of proof. They've got to prove each and every element of the offense as it is alleged and charged. So, if you find numbers one and three but not number two element, not guilty. You've got to find all of them. And you can't speculate, well, we found one, we found three, so two has got to be there. No. You've got to be absolutely [*sic*], to a certainty, a moral certainty."

This remark was preceded by defense counsel's statement to the jury that the judge would instruct them on murder in the first and second degrees. And the judge did so. He carefully and properly instructed the jury on the elements of murder in the first degree and in the second degree, on the Commonwealth's burden of proof, and on the presumption of innocence. "Remarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Com-*

monwealth v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992), and cases cited. In these circumstances, defense counsel's statement, although not elegantly phrased, did not result in a shifting of the burden and does not constitute ineffective assistance of counsel. See *Commonwealth* v. *Coleman*, 30 Mass. App. Ct. 229, 236-237 (1991).

8. *Motion for a new trial.* The defendant's motion for a new trial raised three issues: that he was denied his constitutional right to effective assistance of counsel because his trial counsel failed to advise him of the strategic implications of testifying and not testifying and discouraged the defendant from testifying; that, as a result of this poor advice, he did not make a knowing, voluntary, and intelligent waiver of his right to testify at trial; and, finally, that his counsel was ineffective in failing to obtain the counselling records of a key witness.

We examine the defendant's claim of ineffective assistance of counsel according to the standard set forth above. The defendant maintains that his trial counsel's failure properly to advise him on whether he should testify was error. We conclude, however, that, based on the judge's findings, the defendant's trial counsel adequately advised the defendant on whether he should testify. The defendant states that counsel never explained to him the strategic implications of each choice or how his testimony would provide evidence of self-defense, manslaughter, and lack of premeditation. This is belied, however, by the judge's findings. A motion judge's findings will not be disturbed absent clear error. See *Commonwealth* v. *Pike*, 431 Mass. 212, 225-226 (2000); *Commonwealth* v. *Schand*, 420 Mass. 783, 787 (1995). There was no error. At the hearing, the defendant and his trial counsel testified. The judge found that trial counsel reasonably and adequately advised the defendant of his right to testify and the "probable consequences of each of his options." The record supports these findings: the defendant and his counsel discussed the available defense theories; the means of presenting those theories; whether the defendant should testify; and the difficulties inherent in the defendant's testifying. The judge simply did not believe the defendant's claim that trial counsel failed to inform the defendant that his testimony could assist him in presenting a claim of self-defense, or could establish a basis for murder in the second degree or manslaughter.[7] Rather, the judge noted that trial counsel made the defendant aware that self-

---

[7] In this regard, we note that the judge was "exercising the most basic attribute of the judicial office, that of assessing the credibility of a defendant

defense was a possible theory of defense and that the defendant had made the decision not to testify long before meeting his trial counsel. The judge observed that, had the defendant testified, "he would have been subject to rigorous and intense cross-examination by an experienced prosecutor," and that "[i]n certain circumstances, the wiser tactical decision may be to avoid [so] exposing the defendant." The judge stated that, "[e]ven if in retrospect, the advice of [trial counsel] may have been unsound, it [did] not constitute ineffective assistance . . . [because] [w]hen offered, [i]t was reasonable and appropriate given his knowledge of the strength of the prosecution's [case] and the fact that [the defendant's] version of events was completely contrary to the version offered by neutral eyewitnesses." It was reasonable instead to attempt to impeach the witnesses's testimony through cross-examination. He concluded that the defendant "knew that he had the right to testify and the probable consequences of each of his options" and that counsel's "assessment of the evidentiary landscape and his ensuing tactical decision did not" constitute ineffective assistance. See *Commonwealth* v. *Dahl*, 430 Mass. 813, 819-820 (2000).

The second issue raised by the defendant's motion for a new trial is that, due to his counsel's defective advice, he did not knowingly, voluntarily, and intelligently waive his right to testify. The right to testify on one's own behalf in a criminal case is fundamental. *Harris* v. *New York*, 401 U.S. 222, 225 (1971). *Commonwealth* v. *Hennessey*, 23 Mass. App. Ct. 384, 386 (1987). "The decision whether to testify is to be made personally by the defendant in consultation with his counsel." *Commonwealth* v. *Freeman*, 29 Mass. App. Ct. 635, 640 (1990). It "must be an intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.' " *Id.*, quoting *McMann* v. *Richardson*, 397 U.S. 759, 766 (1970). After the evidentiary hearing on the issue, the judge concluded that the defendant knowingly, voluntarily, and intelligently waived his right to testify. The judge's conclusion was supported by the events at trial; a letter written by trial counsel that the defendant had acknowledged with his signature; and by the

---

who has been convicted . . . The judge saw the defendant and gauged [his] truthfulness . . . . An appellate court should not substitute its judgment . . . when the judge's conclusions are supported and explained." *Commonwealth* v. *Pike*, 431 Mass. 212, 226 (2000).

testimony at the hearing on the motion for a new trial. As to the events at trial, the judge had conducted a thorough colloquy with the defendant before empanelment informing him of his constitutional right to testify or not to testify. The defendant acknowledged that he understood these rights. The judge also asked the defendant whether he had any questions about his right to testify and the defendant indicated that he did not. The judge also inquired whether trial counsel wished the judge to ask the defendant any further questions and trial counsel said it was unnecessary because he had reviewed "everything" with the defendant and the defendant understood the significance of testifying. The defendant did not dispute this representation.

At the motion hearing, the judge indicated that he found the defendant to be "articulate[]," and "coherent[]," and that he understood the issues under consideration. The judge found that the defendant "presented no evidence that he did not possess the ability to make a knowing and intelligent waiver of his right to testify."

The letter written by trial counsel was introduced at the hearing. It outlined the defendant's options and the ramifications of each decision. The defendant admitted at the hearing that the letter identified self-defense as the only possible defense if the witnesses testified as anticipated. The judge found that the letter indicated that trial counsel had discussed the available options with the defendant.

Trial counsel testified at the hearing that the defendant never "really want[ed] to testify," but that he advised the defendant of his right to testify or not testify and that the defendant might change his mind as the trial approached. Counsel also stated that he explained to the defendant that his version of events was inconsistent with the expected testimony of the Commonwealth's eyewitnesses and with the physical evidence, and that therefore the jury might not believe his testimony; and that a self-defense theory would be credible only if the jury accepted the proposition that the defendant reasonably believed that he was in immediate danger of physical harm. Trial counsel further testified that he could not recall specifically advising the defendant that his testimony would support a theory of self-defense. When the Commonwealth rested, trial counsel told the defendant: "[Testifying] could help you. At the same time it's a cutting sword, it could hurt you. So it's your call." The defendant never indicated that he wanted to testify. The judge

concluded that the defendant's testimony at the hearing was against the weight of the evidence offered by the disinterested witnesses at trial and that the credibility of the attorney's testimony was weakened by the attorney's convictions of crimes which are probative of truthfulness (larceny by false pretenses and tax evasion).

The judge found that there was no reason to believe that the defendant was unable to comprehend the court's instructions regarding his right to testify, the letter of his attorney, and his attorney's discussions with him prior to and during the trial. The judge concluded that the defendant made a knowing and intelligent waiver of his constitutional right to testify. The judge's findings and conclusions are supported by the record. *Commonwealth* v. *Schand*, 420 Mass. 783, 787 (1995). Moreover, the defendant's claim that there was no evidence that he understood that only he could present his version of events to support a claim of self-defense is not supported by the record. The defendant admitted that he knew that he had a right to testify and that he was aware that he had a defense of self-defense. He also admitted that he had copies of all the police reports before the trial and that he had read his attorney's letter indicating that, in the circumstances, the only defense "appears to be one of self-defense." It can reasonably be inferred that the defendant, after listening to the testimony of the Commonwealth witnesses, realized that the jury would not hear his version of the events unless he placed it before them. Further, the defendant then had an opportunity to advise the court of his wish to testify after hearing all the evidence, but he failed to do so. See *Commonwealth* v. *Siciliano*, 19 Mass. App. Ct. 918, 920 (1984) (defendant made no statement at trial to express his desire to testify). There is no basis to conclude that the judge was clearly erroneous in determining that the defendant's decision to testify was an after-the-fact concoction.

The final issue in the motion for a new trial is that trial counsel was ineffective because he failed to obtain counselling records of the witness Anna Reyes to impeach her credibility. The judge concluded that such records would not have achieved anything for the defense, as defense counsel cross-examined the witness at length about the different versions of the events that she had given. Thus, such records would have been only

cumulative. The trial transcript supports the judge's conclusion.[8] See *Commonwealth* v. *Sarmanian,* 426 Mass. 405, 407 (1998); *Commonwealth* v. *Gill,* 37 Mass. App. Ct. 457, 467 (1994).

9. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to exercise our authority to reduce the jury's verdict or to order a new trial. The defendant received a fair trial; the jury's verdict is consistent with the evidence that the defendant assaulted Santiago without provocation and that the defendant acted with the requisite malice and premeditation. There was no ineffective assistance of counsel.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

---

[8]The defendant seeks support for his claim from the judge's finding that trial counsel may have had serious matters of his own (his own pending criminal investigation and family illnesses) on his mind during trial. However, when defense counsel sought a continuance because of his sister's illness, it was granted, and he never sought an additional continuance. In fact, when counsel originally requested a continuance, he told the judge, "I have all the motions. I've got all the jury instructions. I've done all my homework. I'm ready. . . . I just maybe need a day . . . so I can put this whole thing [regarding the hospitalization of his sister] together." Further, there is no indication in the record that the defendant was prejudiced by these factors. The problem faced by the defendant was the strength of the evidence against him.