COMMONWEALTH *vs.* ROBERT WALLIS.

Essex. October 10, 2003. - December 18, 2003.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Instructions to jury, Presumptions and burden of proof, Reasonable doubt, New trial, Assistance of counsel, Capital case. *Constitutional Law,* Fair trial, Assistance of counsel. *Malice.*

At the trial of an indictment for murder in the first degree, a Superior Court judge's misstatement that a reasonable inference from circumstantial evidence could be "probable or possible" was an isolated error which could not have contributed to any unfairness at trial, where the judge made quite clear to the jury that merely "possible" inferences were insufficient for their consideration [594]; moreover, later instructions on reasonable doubt and the inference of malice were correct and could not have misled the jury, notwithstanding the earlier erroneous phrase [594-595], and the judge's instruction on "equally reasonable inferences" could not have diluted the Commonwealth's burden of proof [595-596].

The Superior Court judge who presided at the trial of an indictment for murder in the first degree could properly use his knowledge and evaluation of the evidence at trial in concluding that an evidentiary hearing on the defendant's motion for a new trial was not required to explore the defendant's assertion that he had earlier not understood the consequences of his decision not to testify and that he had appeared before the jury shackled and in prison garb. [596-599]

This court concluded that the timing and context of trial counsel's discussions with his client, a criminal defendant, and counsel's subsequent representation to the judge, were inconsistent with the defendant's assertion that his waiver of his right to testify in his own defense was not knowing or intelligent. [599-600]

No ineffective assistance of counsel arose in the circumstances of the trial of an indictment for murder in the first degree, where defense counsel's decision not to have the defendant testify was not manifestly unreasonable. [600-601]

INDICTMENT found and returned in the Superior Court Department on March 22, 2000.

The case was tried before *Richard E. Welch, III,* J., and a motion for a new trial, filed on September 19, 2002, was heard by him.

*James M. Doyle* for the defendant.

*Gregory I. Massing*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. On March 2, 2000, the defendant, Robert Wallis, fatally stabbed his former girl friend. A Superior Court jury convicted him of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. They acquitted him of breaking and entering with intent to commit a felony. Represented by new counsel, the defendant filed a motion for a new trial, which was denied without an evidentiary hearing by the trial judge. The defendant now appeals from the jury verdict and from the denial of his motion for a new trial. As to the trial, he challenges several jury instructions, claims that his waiver of his right to testify was made involuntarily, and argues that trial counsel was ineffective for not advising him to testify in his own defense. As to his motion for a new trial, the defendant argues that the judge abused his discretion in denying the motion without an evidentiary hearing. The defendant also asks that we exercise our power under G. L. c. 278, 33E, to reduce the verdict to murder in the second degree. We affirm the judgment and the order denying the defendant's motion for a new trial.

1. *Facts.* We summarize the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. On March 2, 2000, the defendant voluntarily surrendered to the Lynn police, and confessed to killing the victim. According to his statement, the defendant and the victim had been involved in a romantic relationship, which the victim ended in November, 1999. On the morning of the murder, March 2, 2000, the defendant telephoned the victim and asked to meet her. When she refused, the defendant went to the house where the victim was living at the time and, seeing that her car was not there, broke into the basement. While waiting for the victim to return, the defendant took a knife from the kitchen and put it into his coat pocket. He also drank some alcohol he found in a cupboard. Using a telephone in the kitchen, he called his sister and told her that "you are going to see me in the news." He hid in a dressing room awaiting the victim's return. When she returned home, he

confronted her in the kitchen, and stabbed her in the chest. According to the defendant's statement, the victim extracted the knife and threw it to the floor. He then attempted to strangle her, as she gasped for air.

Police investigation corroborated the defendant's statement. The police found a bloody kitchen knife on a table near the victim's body, and cigarette butts and a drinking cup in the dressing room. A piece of plywood, which had been covering a basement coal chute, had been removed and left on the basement floor. The police also noted that, when he surrendered, the defendant's hands and clothing were stained with blood.

At trial, defense counsel introduced evidence of the defendant's history of abuse as a child, depression, and alcoholism. The victim's sister and former brother-in-law testified that the defendant was known to drink heavily. The defendant's sister testified that he was an alcoholic and had been hospitalized for depression and suicide attempts. She also testified that their mother had abused the defendant when he was a child. However, each witness who had encountered him on the day of the murder testified that the defendant had no difficulty that day with standing, walking, understanding, or making himself understood. According to the police officers who took his statement, the defendant showed no signs of intoxication and answered all questions appropriately and completely.

The defendant called three witnesses to testify concerning his mental state at the time of the killing: a mental health worker, a clinical psychologist, and a forensic psychologist. The mental health worker, Jeffrey Losier, testified that while in custody the defendant had expressed suicidal feelings, but that he (Losier) had concluded that committing the defendant to a hospital was not necessary. Losier testified that the defendant told him that he "got confused" and murdered his girl friend "because she wouldn't understand."

Dr. Stephen DeLisi, a clinical psychologist at Bridgewater State Hospital, opined that the defendant suffered from "a major depression."[1] He testified that, although the defendant "could have been impaired" at the time of the killing, he was able to

_____

[1] Dr. Stephen DeLisi's opinion was based on his review of the police report; medical records from BayRidge Hospital, where the defendant had been

appreciate the wrongfulness of his act and to conform his conduct to the requirements of law. The defendant told him that, as the defendant stabbed the victim, he had what the defendant characterizes as a "flashback" and had seen his mother's face "in [his] mind" and that the defendant was "flooded with memories" of the abuse his mother had perpetrated on him. This led Dr. DeLisi to conclude that the defendant's depression, unresolved feelings from his childhood, and possible presence of alcohol affected his mental state at the time of the murder. Dr. DeLisi also testified that he thought the defendant "exaggerat[ed] his depression somewhat primarily for the purpose of staying at Bridgewater [State Hospital] rather than go[ing] back to the jail."

Dr. Robert Joss, a forensic psychologist, opined that the defendant suffered from a "major depressive disorder, possibly with psychotic features."[2] Dr. Joss testified that the defendant was able to appreciate the wrongfulness of his act and to conform his conduct to the requirements of law, but concluded that the defendant's mental disorder, aggravated by alcohol consumption, "impaired his judgment and quite possibly his recognition of reality" at the time of the murder. He also "thought there might have been some moderate embellishments" when the defendant reported his mental health history, and testified that the defendant had the capacity to act with extreme atrocity or cruelty. He said he did not have an opinion as to whether the defendant could deliberately premeditate, but it was his opinion that, based on the defendant's "depression," he would have "difficulty" weighing the consequences of his actions.

Dr. Martin Kelly, a board-certified forensic psychiatrist, testified for the Commonwealth. He opined that it was unlikely that the defendant suffered from a major depression, and that he had no mental disease or defect that would affect his ability to

hospitalized about three months before the stabbing; two interviews with the defendant; and a report by Dr. Christine Schnyder, a court clinician, which documented the defendant's alcohol abuse, blackouts, prior hospitalizations, and suicide attempts.

[2]Dr. Joss's opinion was based on his review of medical records from four hospitals, the report by Dr. Schnyder, the defendant's statement to the police, and five interviews with the defendant.

premeditate, form specific intent, or "weigh the pros and cons" of his actions.[3]

2. *Jury instructions.* The defendant argues that several of the judge's jury instructions combined to reduce the Commonwealth's burden of proof, thereby denying him a fair trial. The defendant did not raise these objections at trial, and we therefore review his claims for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Niemic,* 427 Mass. 718, 720 (1998).

Because there was no dispute that the defendant had killed the victim, the critical issue at trial was the defendant's mental state at the time of the killing. The defendant argues that, because the jurors were presented primarily with circumstantial evidence, the judge's instructions on inferences that permissibly could be drawn from such evidence were crucial. In fact, he continues, the judge gave an erroneous instruction regarding the drawing of inferences from circumstantial evidence, an erroneous instruction that was uncorrected and exacerbated (he claims) by the judge's later instructions. We examine each point in turn.

Regarding the drawing of an inference from circumstantial evidence the judge instructed: "It simply has to be a reasonable inference that you draw based upon your common sense and your life experience. It has to be a probable *or* possible inference to draw" (emphasis added). The defendant correctly points out that the judge should have instructed that an inference must be "reasonable *and* possible." See *Newman* v. *Commonwealth,* 437 Mass. 599, 602 (2002), quoting *Commonwealth* v. *Casale,* 381 Mass. 167, 173 (1980). We conclude that this isolated error, which, when read in context, appears to have been a slip of the tongue, could not have contributed to any unfairness at the trial. See *Commonwealth* v. *Niemic, supra,* quoting *Commonwealth* v. *Perez,* 390 Mass. 308, 313 (1983), and *Commonwealth* v. *Galford,* 413 Mass. 364, 371-372 (1992), cert. denied, 506 U.S. 1065 (1993) ("We '[do] not . . . scrutinize[] bits and pieces [of

---

[3]Dr. Kelly's opinion was based on his review of the police reports, witness statements, court evaluations, the defendant's medical records, and a two-hour interview with the defendant.

instructions] removed from their context.' . . . '[T]he adequacy of instructions must be determined in the light of their over-all impact on the jury' ").

The judge's misstatement that a reasonable inference could be "probable or possible" was made only once, and was embedded in lengthy instructions, which carefully, repeatedly, and correctly emphasized that any inference drawn by the jury must be "reasonable," "rational," "probable," and "logical," and not merely "possible." In fact, immediately before the erroneous phrase, the judge explained that it "would be improper to base your verdict on guesswork or speculation."[4] In other words he made quite clear to the jury that merely "possible" inferences were insufficient for their consideration.

This case is quite unlike *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 560-563 (2001), and *Commonwealth* v. *Sires*, 405 Mass. 598, 601 (1989), on which the defendant relies, where we concluded that erroneous jury instructions constituted reversible error. In *Commonwealth* v. *McLaughlin*, *supra* at 561 n.2, the judge gave an erroneous instruction on provocation, followed by a correct instruction, followed by another erroneous instruction, followed by another correct instruction. In *Commonwealth* v. *Sires*, *supra* at 599-600, the judge gave the jury an erroneous instruction during his initial charge, and then repeated it when the jury on two occasions requested clarification of his instructions during their deliberations. No such repetition of the erroneous phrase occurred here.

The defendant next argues that later instructions aggravated the "harm" done by the erroneous instruction on reasonable inferences ("probable or possible") and reduced the Commonwealth's burden of proof. None of his claims concerning any challenged instructions withstands scrutiny. First, the defendant argues that the judge provided a "gratuitous addition" to an otherwise "non-controversial version" of the *Webster* charge, *Commonwealth* v. *Webster*, 5 Cush. 295, 320

---

[4]The judge instructed the jury: "You do not base [your verdict] on guesswork or speculation or conjecture. That's not what I'm talking about. That would be improper to base your verdict on guesswork or speculation. But you are entitled to make reasonable inferences. A reasonable inference based upon your common sense is not guesswork, it's not speculation."

(1850).[5] Not only did the defendant request that very instruction, but it is a nearly exact recitation of the last sentence of the *Webster* charge on reasonable doubt.[6] *Id.* We have described this as part of the "classic definition" of the reasonable doubt standard of proof. *Commonwealth* v. *Mack,* 423 Mass. 288, 291 (1996). The instruction was properly given, and did not exacerbate any possible harm from the judge's isolated earlier misstatement.

Second, the defendant argues that the judge's instruction that the jury could infer malice from the intentional use of a dangerous weapon[7] and the earlier erroneous "probable or possible" phrase combined "with synergetic effect" to reduce the Commonwealth's burden of proof. The judge's instruction on the inference of malice, set forth in note 8, *infra,* follows our model instructions. See Supplemental Instruction No. 5, Model Jury Instructions on Homicide 61 (1999). That correct instruction could not have misled the jury, notwithstanding the earlier erroneous phrase. See *Commonwealth* v. *Szczuka,* 391 Mass. 666, 675 (1984).

Finally, the defendant argues that the judge's instruction on "equally reasonable inferences" diluted the Commonwealth's burden of proof by suggesting that the jury could select the "more possible" of two improbable inferences.[8] The instruction on equally reasonable inferences was requested by the defendant

[5]The judge instructed the jury: "This is what we mean by proof beyond a reasonable doubt; because if the law should go further than this and require absolute certainty, well, then it would exclude circumstantial evidence altogether."

[6]"This we take to be proof beyond reasonable doubt; because if the law, which mostly depends upon considerations of a moral nature, should go further than this, and require absolute certainty, it would exclude circumstantial evidence altogether." *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850).

[7]The judge instructed the jury: "As a general rule, you are permitted to infer that a person who intentionally uses a dangerous weapon on another person is acting with malice."

[8]The judge instructed the jury: "If . . . you have a situation, however, where in your own minds you decide, well, from this set of facts I could draw two equally reasonable inferences and you say to yourselves, well, from this set of facts I can draw two equally reasonable inferences and they're equally reasonable and one favors the defendant and one favors the Commonwealth, well, in a criminal case you must draw the equally reasonable inference that your logical common sense tells you is equally reasonable that favors the

(in slightly different language), and was correct. See *Commonwealth* v. *Robertson*, 408 Mass. 747, 754 (1990); *Commonwealth* v. *Lowe*, 391 Mass. 97, 108-112, cert. denied, 469 U.S. 840 (1984). Reasonable jurors are not likely to have selected a more possible of two improbable inferences, given the judge's repeated instructions that they could draw only "reasonable" inferences from the evidence.

3. *Motion for a new trial.* The defendant claims that the judge abused his discretion by denying his motion for a new trial without holding an evidentiary hearing. A judge may, in his or her discretion, decide a motion for a new trial without an evidentiary hearing where no substantial issue is raised by the motion or affidavits. Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). See *Commonwealth* v. *Martinez*, 437 Mass. 84, 98 (2002). Particularly where, as here, the motion judge was also the trial judge, the judge's finding that the defendant's motion and affidavit did not raise a substantial issue is entitled to substantial deference, *Commonwealth* v. *Britto*, 433 Mass. 596, 602, 608 (2001), and the judge could properly use his knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new trial without an evidentiary hearing. See *Commonwealth* v. *DeVincent*, 421 Mass. 64, 69 (1995).

In his motion for a new trial and accompanying affidavit the defendant raised three issues: (1) he was effectively denied the right to testify in his own defense because his waiver was not knowing, intelligent, and voluntary; (2) he was denied effective assistance of counsel because his attorney did not properly explain to him the implications of his decision not to testify in his own defense; and (3) he appeared for segments of his trial shackled and in prison garb, in violation of his Federal and State constitutional rights. All three claims are grounded in settled case law. See, e.g., *Commonwealth* v. *Degro*, 432 Mass. 319, 335 (2000) ("The right to testify on one's own behalf in a criminal case is fundamental"); *Commonwealth* v. *Ladetto*, 353 Mass. 746, 746 (1967) ("it is desirable that prisoners appear

defendant; because, if they're equally reasonable, you should draw the one that favors the defendant because the defendant does not have any burden of proof."

before the jury unshackled"); *Guerin* v. *Commonwealth*, 339 Mass. 731, 734 (1959) (recognizing "fundamental character of the right of a person accused of a serious crime to have the aid and advice of counsel"). But the mere assertion of such a claim does not mean that an evidentiary hearing is necessarily required. Rather, we consider whether the judge, relying on his familiarity with the trial, abused his discretion in concluding, as he did here, that the defendant's affidavit in support of these claims was not credible. See *Commonwealth* v. *Britto*, *supra* at 608.

We discuss briefly the trial circumstances to place in context the defendant's decision not to testify. The thrust of his argument is that, had he testified, he would have explained to the jury that, as he stabbed the victim, he had a flashback image of his mother who had abused him repeatedly when he was a child. At trial, this explanation of the defendant's actions on the day of the killing was introduced through the statements of the defendant's expert witness, Dr. DeLisi, which the judge ruled, correctly, were hearsay and could not be admitted for the truth of the matter.

After the defense called its last witness (who finished testifying in the late afternoon), counsel informed the judge that he planned to rest when the trial resumed the following day. That afternoon the judge stated that, considering the evidence presented, he did not see any "independent" "substantive evidence" entitling the defendant to an insanity instruction.[9] The judge also addressed the defendant, reminding him that he could, if he so decided, testify the following morning. The following morning the defendant did not testify, and the defense rested. Later, consistent with his earlier indication, the judge ruled that he would not give an insanity instruction because there was insufficient evidence to warrant it. He did agree, however, to give an instruction allowing the jury to consider whether the defendant's history of depression, alcoholism and child abuse had affected his ability to form the requisite intent to murder.

In his posttrial affidavit the defendant claimed that he did not

[9]The judge noted specifically that both of the defendant's expert psychologists had opined that the defendant did not lack criminal responsibility.

understand that evidence of his state of mind at the time of the murder ("flashback") had been admitted for a limited purpose only, and that his own testimony was required to permit the jury to consider substantively his statement that he saw his mother as he stabbed the victim.[10] The judge reasonably concluded that the defendant's posttrial assertion was not credible. During the trial, the judge explained at length, in the presence of the defendant, that none of the defendant's statements to his experts was admissible substantively. At the conclusion of the judge's explanation, defense counsel requested a recess so that he could confer with the defendant. The judge granted the request, and defense counsel conferred with his client. When the trial resumed, defense counsel told the judge that he had "very carefully and slowly" explained the judge's ruling, that the defendant understood "the consequences of not taking the stand," and that he had decided not to testify. Next, the judge brought the defendant to sidebar and asked him directly whether he understood his right to testify, his counsel's advice, and whether he was satisfied with his counsel's representation. The defendant answered each inquiry in the affirmative. In short, at trial the judge proceeded with an abundance of caution, taking every reasonable step to ensure that the defendant understood fully the implications of his decision not to testify. The judge did not abuse his discretion in concluding posttrial that an evidentiary hearing was not required to explore the defendant's assertion that he had earlier not understood the consequences of his decision not to testify.

The defendant also claimed he did not understand that, without his own testimony, the judge would refuse to give an instruction on insanity. The judge properly rejected this claim. As we noted earlier, prior to the close of the evidence the judge specifically stated, in the presence of the defendant, that he was not inclined to give an insanity instruction. The judge informed the defendant that he could still testify before the defense rested, and did not make his final ruling until the close of all the

---

[10]The defendant also asserts that the jury were not allowed to consider the "story of the events of my past life." Evidence regarding the defendant's alcoholism, depression, and child abuse, however, was admitted for its full probative value through the testimony of the defendant's sister and Dr. DeLisi and Dr. Joss, and was therefore before the jury.

evidence. Relying on his knowledge of what had occurred at the trial, the judge did not abuse his discretion in finding the defendant's posttrial affidavit to the contrary was not credible in this respect as well. See *Commonwealth* v. *Degro*, 432 Mass. 319, 337 (2000).

The defendant also asserted that "no one" explained to him the consequences of his choice not to testify. The judge, however, was fully aware that, immediately following his ruling on the admissibility of the defendant's statements to his medical experts, he granted defense counsel's request for a recess to explain the consequences of the ruling to the defendant. He was also aware of defense counsel's and the defendant's subsequent representations to the judge. The judge was entitled to view the posttrial affidavit with considerable skepticism. See *Commonwealth* v. *Castro*, 438 Mass. 160, 174 (2002) (defendant voluntarily waived right to testify because judge informed defendant of right, and confirmed that defendant had discussed right with counsel, as well as risks and benefits). Further, the judge ruled that the defendant's decision not to testify, in light of the evidence, could have been a "wise tactical choice" to avoid what would in all likelihood have been a devastating cross-examination of the defendant. We see no basis to conclude that this was an abuse of discretion.

Last, in light of the judge's opportunity to observe the defendant throughout the trial, we defer to his finding discrediting the defendant's assertion that he had appeared before the jury shackled and in prison garb. There was no abuse of discretion in discrediting the defendant's affidavit and declining to hold an evidentiary hearing.

4. *Invalid waiver of right to testify.* The defendant argues here that his waiver of his right to testify in his own defense was not knowing or intelligent. He raises no argument not previously presented in his motion for a new trial. The judge was in the best position to evaluate the claim, and we have concluded that he did not abuse his discretion when he denied that motion. Moreover, a review of the record strongly undercuts the defendant's posttrial assertion that, while he was told that he could choose whether to testify, he was not aware of "the probable consequences of each of his options." *Commonwealth* v.

*Degro, supra* at 335. The timing and context of trial counsel's discussions with the defendant, and counsel's subsequent representation to the judge, are inconsistent with the defendant's assertion.

5. *Ineffective assistance of counsel.* The defendant argues that he was deprived of effective assistance of counsel essentially because his attorney did not call him as a witness, thereby preventing him from raising a defense of insanity and undermining his defense of lack of intent to murder and inability to premeditate. We first determine whether there was any serious failure by counsel representing the defendant at trial, giving due deference to trial counsel's tactical decisions. *Commonwealth* v. *LaCava*, 438 Mass. 708, 712-713 (2003). We conclude there was none, bearing in mind that, "[u]nless a tactical decision of trial counsel was 'manifestly unreasonable when made,' we will not find ineffectiveness." *Id.*, quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998).

We have previously discussed at some length the careful consideration obviously given by both defense counsel and the defendant himself to the question whether it was advisable for the defendant to testify and to subject himself to cross-examination by the prosecutor. We have also recognized the reasonableness of the judge's conclusion that defense counsel's decision not to call the defendant as a witness was, in light of the evidence, a tactical decision, made only after consultation with the defendant. The defendant now challenges his counsel's advice, positing that a successful insanity defense would have been established primarily on his statement, recounted to Dr. DeLisi and Dr. Joss, that, at the time of the murder, he was thinking about his mother who had abused him as a child. This evidence, if presented to the jury for their consideration substantively, would, he claims, have buttressed his argument that an insanity instruction was warranted. See *Commonwealth* v. *Mills*, 400 Mass. 626, 627-628 (1987). But defense counsel, in consultation with his client, had to weigh this benefit (whatever its strength) against the risks of exposing the defendant to cross-examination, which, contrary to the

defendant's claim here, would have been risky, to say the least.[11] By way of example only, the defendant did not describe seeing his mother as he stabbed the victim until weeks after the incident, despite earlier opportunities to reveal the information to several mental health experts. His detailed statement to the police made no mention of the fact. He also told the police that he had been thinking about killing the victim since the previous evening because he "thought she was with another man," which would have seriously undermined any claim that he stabbed the victim, imagining her to be his mother. As his statement makes clear, it was the defendant's anger directed toward the victim for leaving him that fueled his actions on the day of the killing. Had defense counsel called the defendant to testify in the face of this and other potentially damaging evidence, and had counsel's strategy failed, we have little doubt that the defendant would be making the converse argument here. The trial decision not to have the defendant testify was not "manifestly unreasonable," *Commonwealth* v. *Martin, supra* at 822, and there was no ineffective assistance of counsel in the circumstances of this case. See *Commonwealth* v. *Gaboriault,* 439 Mass. 84, 93 (2003) (defense counsel, faced with experts that would testify to diminished capacity claim, but not lack of responsibility, made logical, tactical decision to focus on diminished capacity). See also *Commonwealth* v. *Burgess,* 434 Mass. 307, 318 (2001) ("Counsel's choice not to call the defendant will not be gainsaid absent a showing that the defendant's own testimony would have materially assisted the defense").

6. *General Laws c. 278, 33E.* We have reviewed the record, and have considered in particular the defendant's request that we reduce the verdict to murder in the second degree because of the defendant's history of abuse as a child, depression, and alcoholism. We conclude that there is no reason to exercise our power under G. L. c. 278, 33E, to order a new trial or to reduce

[11]Both Dr. DeLisi and Dr. Joss had opined that the defendant was able to appreciate the wrongfulness of his act and to conform his conduct to the requirements of the law. The defendant's prediction of a successful insanity defense ignores the fact that his own experts did not support that defense. In considering whether the strategic risks of testifying would be outweighed by the potential benefit of an insanity instruction, counsel could properly consider the likelihood of success on an insanity defense to be quite slim.

the verdict. See *Commonwealth* v. *McGeoghean*, 412 Mass. 839, 843-844 (1992); *Commonwealth* v. *Lake*, 410 Mass. 47, 51-52 (1991).

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*